

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

## No. 02-17-00279-CR

———————————————

CLARENCE DAVID MALLORY JR., Appellant

V.

THE STATE OF TEXAS

On Appeal from the 297th District Court
Tarrant County, Texas
Trial Court No. 1395156D

Before Sudderth, C.J.; Gabriel and Pittman, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

## I.  Introduction

In six points, Appellant Clarence David Mallory Jr. appeals his conviction for capital murder.  *See* Tex. Penal Code Ann. § 19.03(a)(2).  We affirm.

## II.  Factual Background

In 2014, Ashlea Harris worked as an assistant manager at American Eagle at Hulen Mall.  Christopher Cravey, the manager of the store, described Harris as a phenomenal employee who was loved by everyone and was generally regarded as "like the mother of the store."

In June 2014, Harris was appointed to run the store while Cravey was on medical leave.  During that time, Carter Cervantez worked at the store as an assistant manager.  Lindsay Green, another American Eagle employee, testified that she believed that Cervantez saw Harris as her competition in trying to catch the attention of the district manager for a promotion.  Cervantez hired Mallory to work at American Eagle.  She was also in a romantic relationship with him.

**Theft at American Eagle on August 24, 2014**

Surveillance video from American Eagle showed that around 1:14 a.m. on August 24, 2014, someone walked directly to the area where deposits were kept, unlocked the deposit box, and took the deposit.  The person on the video was wearing something to cover his head and never looked up, indicating that he knew there were security cameras in the store.

The key was left in the deposit box, and it belonged to an assistant manager named Yasmin. But Yasmin had not closed the store the night the theft occurred and did not appear to be the person in the video.[1] Instead, Cervantez had closed the store that night. Cervantez also admitted that she had left the back door unlocked, thus facilitating the intruder's access to the store.

The next morning when Harris discovered that the previous day's deposit was missing, she called loss prevention, Cravey, and the district manager. Green called the police and also called Cervantez to tell her that they needed "all hands on deck." According to Green, Cervantez responded, "I don't know what the big deal is because insurance can cover this."

When Cravey arrived, he and Harris watched the video from the security cameras, and Harris identified the person on the video as Mallory.[2] Until that point, Cravey had been unaware that Cervantez had hired Mallory to work at the store. Mallory had previously worked at American Eagle in Amarillo and was labeled in the American Eagle system as "non-rehireable"—meaning that he was not to be hired by any location. When Cravey reviewed Mallory's personnel file, he discovered that

---

[1]Cravey later learned that Yasmin had left her store keys unattended on a table for approximately five minutes the previous day while Cervantez was in the area folding jeans.

[2]Green, too, watched the videos from the security cameras and also believed that the person involved in the theft was Mallory based on his physical build and because he knew how to avoid the security cameras.

when Cervantez had hired Mallory, she had changed his Social Security number and his name in the system.

After Cravey and Harris had watched the video, Harris suspended Cervantez, who reportedly handed over her store keys calmly and exited the store. One week after Cervantez's suspension, Cravey called Cervantez and told her that she had been terminated for leaving the store unsecured. Cravey testified that Cervantez was very upset and requested the regional manager's phone number. Cravey also testified that he believed that Cervantez would have known that Harris had identified her as a possible accomplice to the theft.

Cravey scheduled Mallory to work on three consecutive days, but he never called in or showed up for work. Pursuant to American Eagle's policy, Mallory was automatically terminated for three consecutive "no call, no-shows."

**Thanksgiving Day and the Day of the Offense**

Approximately two months later, on November 27 (Thanksgiving Day), Harris worked from when the store opened at 6:00 p.m. until 3:00 a.m. the following day. She arrived home from work around 3:40 a.m. on November 28.

Alexis Torres Bunch, who had been looking after Harris's dog while she was at work, visited with Harris at her apartment until 4:45 a.m., and Harris locked the door when Bunch left. At 6:56 a.m., Bunch had a missed call from Harris. Two or three minutes later when Bunch saw the missed call, she tried to call Harris back but was unsuccessful in reaching her.

4

Steven Lee, who lived downstairs and diagonally across from Harris, testified that the day after Thanksgiving, he noticed a black Infiniti with a faded Toll tag sticker on its roof that he had never seen before parked outside. When Lee left for work around 7:30 a.m., the Infiniti was still in the parking lot.

Patrick Sweet testified that in November 2014, he lived in an apartment just below Harris's. On November 28, Sweet was awakened by a loud scream and glanced at the alarm clock, which showed that it was 7:30 a.m. As Sweet laid in bed wondering what was going on upstairs, he heard a loud thud right above him and could hear labored breathing. While Sweet considered what he should do, he heard Harris's front door close. When Sweet looked out the window, he saw a darkly-tinted black Infiniti driving away. Because that was not the vehicle that Harris usually drove, Sweet assumed that a friend of Harris's had picked her up for work, so he laid back down.

But before Sweet fell asleep, his carbon monoxide detector went off. As Sweet checked his apartment for problems, he noticed that water was dripping from the ceiling in his bathroom. Assuming that there was a fire in Harris's apartment, Sweet called 911. He then took some of his belongings and moved his car across the street away from his apartment building. Before firefighters arrived, Sweet saw a neighbor from the back of the building and one of the maintenance men enter Harris's apartment. Sweet was unaware that Harris was in the apartment until later when he

saw the looks on the firefighters' faces. At that point, he realized that the noises he had heard earlier were "out of the ordinary," and he told the police about them.

Jeff Kayser, another friend and neighbor of Harris's, testified that he woke up to the sound of fire alarms that same morning. He dressed and ran over to the building where Harris lived. Harris's pickup was parked outside, so when a neighbor said that he thought the smoke was coming from upstairs, Kayser ran upstairs and kicked Harris's door open. Kayser testified that the apartment was full of smoke and that water was spraying from the sprinkler system. Kayser yelled for Harris and crawled midway to the kitchen before the smoke forced him back out of the apartment and into fresh air. Kayser attempted two other times to make his way through the apartment but was unable to do so because of the smoke. Kayser did not make a fourth attempt because, by then, firefighters had arrived on the scene.

Fort Worth Fire Department Lieutenant Jarrod Pavlechko responded to the fire around 8:00 a.m. When he arrived, a resident told him that there was a possibility that someone was inside the apartment. He entered the apartment, and after determining that the source of the smoke was the bed, he raised a window to allow the smoke to clear. At that point, he saw the body of a female in front of the bed. When he grabbed her arm, he noticed that her wrists were duct taped. After he was unable to detect a pulse, he radioed a request for the police and the crime scene unit to come to the scene.

**The Fire Investigation**

Wallace E. Hood Jr., an arson investigator with the Fort Worth Fire Department, testified that the fire in Harris's apartment had already been extinguished when he arrived at the scene around 8:45 a.m. During his investigation, he located multiple origins of the fire, including in the bed, on Harris's body, and in the closet. Hood noted that the smoke detector had been removed and was underneath the mattress. Hood opined that the ignition source was some form of open flame, such as a match or a cigarette lighter, and he ruled out all accidental sources of ignition, concluding that the fire was set on purpose.

**The Initial Police Investigation**

When Detective Jerry Cedillo with the FWPD homicide unit arrived on the scene at 10:22 a.m., he spoke with several of the residents and with Cravey. Detective Cedillo testified that Harris's hands and feet had been duct taped, that she had suffered serious head trauma, that her throat had been cut, and that she had been set on fire. Detective Cedillo wanted to search inside Harris's pickup that was parked at the apartments, but the keys to that vehicle were never found. After receiving photographs of Mallory and Cervantez from Cravey and researching their names and the black Infiniti through the FWPD databases, Detective Cedillo found that Mallory and Cervantez were both suspects in the August 24 theft at American Eagle and that they lived approximately two miles from Harris's apartment.

7

When Detective Cedillo went to the address for the apartment where Mallory and Cervantez lived, he found a white Cadillac that belonged to Mallory. The black Infiniti was not there at that time.

Mark Sedwick, a special agent with the FBI and a member of the Cellular Analysis Survey Team, testified as to the content of texts that had been sent at 11:52 a.m. on November 28 between a phone associated with Mallory and a phone associated with Cervantez:

[Her phone:] Hey, remember that thing you said I didn't clean well? Did you clean it? Did we leave it behind?

[His phone:] We left it. I didn't touch it.

[Her phone:] Well, damn. That's not good. Take out all the trash and leave that. . . . [Five minutes elapse] . . . David, I need to take care of that. I'm so sorry I forgot.

**Suspicious Activity at Hulen Mall the Following Day**

The surveillance video from the front of the American Eagle store showed that at around 2:00 a.m. on Saturday, November 29, someone with a covered face knelt down next to the lock on the gate and attempted to unlock and raise the gate. The attempt was unsuccessful, however, because Cravey had already changed the locks.

Around 3:45 a.m., a black Infiniti was spotted in the parking lot of the apartment where Mallory and Cervantez lived.

Four hours later, Mallory and Cervantez exited their apartment, got in the black Infiniti, and drove to Hulen Mall.[3] Cervantez exited the car near the door of the mall, and Mallory parked the car. Detective Cedillo called for dispatch to send marked patrol cars to make a traffic stop of the Infiniti once a traffic violation was observed. Detective Cedillo then went into the mall but was unable to locate Cervantez.

In the meantime, at 7:50 a.m., the surveillance video from American Eagle once again showed a person with something covering her face[4] approach American Eagle. Cravey arrived at the store five minutes later.

When the patrol officers made contact with the Infiniti, they confirmed that the driver was Mallory. Detective Ernie Pate with the FWPD introduced himself to Mallory, told him that he was part of a team investigating car burglaries at Hulen Mall, and said he wanted to know why Mallory was in the parking lot. Mallory told Detective Pate that his girlfriend, Cervantez, had gone into the mall to pick up some papers at Aeropostale. Mallory described Cervantez as wearing pink scrubs, even though she had been seen wearing a gray sweatshirt and a black hat when she exited the car. When Detective Pate asked Mallory to voluntarily go downtown to visit with the police, Mallory agreed.

---

[3]Mallory and Cervantez lived in an apartment on Greenwood Creek Drive, which is off Bryant Irvin Road near Fort Worth Country Day School. Detective Cedillo traced the route that Mallory and Cervantez took to get to the mall, which was not far from their apartment.

[4]Cravey testified that he believed the person who approached the store both times was Cervantez.

Shortly after Mallory left with the patrol officers, however, they alerted Detective Pate that Mallory had changed his mind and wanted to return to the mall. But after Detective Pate confirmed with the patrol officers that Mallory did not have his driver's license on his person despite the fact that Detective Cedillo had seen him driving the Infiniti on a public roadway, Detective Pate decided to arrest Mallory. So rather than being returned to the mall, Mallory was transported to the police station downtown instead.

Detective Pate, who stayed with the Infiniti while he waited for a wrecker to arrive, took a photo of the vehicle. When he showed it to Lee, Lee confirmed that it was similar to the car he had seen in the apartment parking lot the previous day. The Infiniti was towed to the FWPD impound lot and was placed in a secure bay.

Later that day, Officer Tamayo located Cervantez in the parking lot at her apartment complex.[5] When Detective Cedillo asked Cervantez to go downtown to police headquarters to be interviewed about a case that he was working on, she agreed. While interviewing Cervantez, Detective Cedillo also took photographs of Cervantez, who had superficial scratches on her arms. After the interview, Detective Cedillo allowed Cervantez to return to her apartment.

Detective Cedillo also saw Mallory in the hallway at the police station. He initially thought Mallory was wearing a toboggan, but it turned out to be a ski mask in

---

[5]Detective Cedillo testified that he contacted Officer Tamayo with the fugitive unit because he "has a great deal of surveillance skills."

10

apparently new condition (without any noticeable wear and with the plastic price-tag fastener still attached). The photographs taken of Mallory showed that he had a fresh injury to his lower lip, which was swollen.

**Searches of Mallory and Cervantez's Apartment**

Detective Matthew Barron with the FWPD homicide unit prepared the initial search warrant for the address where Mallory and Cervantez resided. During the November 29 search, Detective Barron saw a plastic tub near the front door that contained some bungee cords and some rope and a lock in a kitchen drawer. In the trash, he found a box associated with a TASER, a charging cord, and some strands of duct tape. Detective Barron also found a damaged deadbolt lock in the apartment. The search of Mallory and Cervantez's apartment also uncovered two other locks that had apparently been used for practice, including one conveniently labeled "lock picking practice lock."

On December 4, Mallory and Cervantez's apartment was searched a second time, and a "business-type key" was found in the kitchen trash can. The key opened the dressing room doors and a storage closet at American Eagle at Hulen Mall. The key was not in the trash during the first search of Mallory and Cervantez's apartment.

**Search of the Black Infiniti**

Officer J.J. Jeanes with the FWPD crime scene unit searched the black Infiniti. He took photos of items that were found in the vehicle, including a plastic bag inside a black trash bag, a sharpening stone for a knife, a nine-millimeter cartridge, a cell

phone, a walkie talkie, a Buck knife with a sheath, a plastic tub, some men's boots that had a cell phone in them, some clothing, a toboggan with a hole cut in it, a tarp still inside the package, and a kitchen knife. Under the driver's seat, Officer Jeanes found a loaded Glock 19 with a bullet in the chamber. Officer Jeanes also found various documents in the car, including a receipt reflecting an order from Lock Pickers Mall for a cutaway practice lock that was sent to the address of the apartment where Mallory and Cervantez lived. A lock picking instruction manual was also found during the search of the vehicle. Officer Jeanes testified that the floor mat from driver's side of the vehicle revealed the possible presence of blood.

**Search in Lueders, Texas, and Search of Mallory's Cadillac**

Detective Cedillo testified that after the contents of Mallory's cell phone were analyzed, one of the text messages on Mallory's cell phone contained latitude and longitude coordinates. After entering the latitude and longitude coordinates into Google Earth, Detective Cedillo then drove to that specific location, which was near Lueders, Texas. When he arrived at the intersection of the coordinates, he discovered a hole, which he described as "a human grave," that was approximately six feet long, two and a half feet wide, and three feet deep. Detective Cedillo testified that he obtained a search warrant to search Mallory's Cadillac, and using the keys that were recovered from the black Infiniti, he unlocked the Cadillac's trunk where he found certain items that were relevant to his investigation: two shovels, a box of plastic sheeting, and a box of Craftsman sockets.

12

**The Autopsy**

Dr. Richard Fries, a deputy medical examiner at the Tarrant County Medical Examiner's Officer, performed the autopsy on Harris's body. The autopsy revealed that Harris had numerous injuries:

- a laceration on the right side of her scalp;

- a small laceration with a surrounding bruise on the right side of her scalp;

- a patterned bruise on the right side of her face;

- a bruise between her eyes;

- a bruise around her left eye;

- a small laceration on the bridge of her nose;

- a laceration on her right cheek with a surrounding bruise;

- a laceration on the left side of her face;

- a scrape on the right side of her nose and upper lip;

- a bruise on her right lip;

- a scrape and lacerations of her lip;

- a scrape on her chin;

- a star-shaped laceration with a surrounding bruise behind her left ear, which was consistent with having been pistol-whipped;

- a cut on the right side of her neck (like one caused by a knife);

13

- a bruise on the right side of her neck;

- bruises and abrasions on the left side of her neck;

- petechiae[6] on her neck, eyes, and larynx;

- a bruise on the front of her chest;

- a bruise on her right arm;

- a scrape on her elbow;

- a bruise on the back of her left arm;

- a bruise on the back of her left hand;

- a bruise at the base of her left thumb, which was "likely due to the duct tape ligatures being around [her] wrist";[7]

- an abrasion on her left little finger;

- a laceration inside her upper lip extending to the frenulum;

- additional lacerations and bruising in her lower lip; and

- fractured cricoid cartilage in her larynx.

Dr. Fries testified that the injuries observed on different parts of Harris's face indicated that they were caused by multiple blows. Dr. Fries explained that the petechiae in Harris's eyes reflected asphyxia or strangulation, which could have occurred by someone tying a cord or a rope around her neck and squeezing tightly.

---

[6]Petechiae is defined as minute hemorrhages or purpuric spots that appear on the skin or mucous membranes or within an organ. Webster's Third Int'l Dictionary 1689 (2002).

[7]Harris's hands had been tied behind her back with duct tape around her wrists.

According to Dr. Fries, it takes quite a bit of time and quite a bit of sustained pressure for someone to be fully asphyxiated.

Dr. Fries further testified that a fractured cricoid is "the least common place we see fractures in asphyxia or strangulation-type deaths" because it consists of cartilage that is pliable. He explained that cricoid fractures are seen mostly in motor vehicle accidents or something involving a significant amount of force. The sample of Harris's aorta blood that Dr. Fries tested was negative for carbon monoxide, which indicated that Harris was not alive when the fire was set. Dr. Fries did not find any injuries on Harris's body suggesting that a Taser had been used on her.

Dr. Fries concluded that Harris's cause of death was asphyxia and blunt force trauma to the head and neck and that the manner of Harris's death was homicide.

**The Duct Tape**

John Witkowski, a forensic scientist in the trace evidence section at the Texas Department of Public Safety Regional Crime Lab, analyzed duct tape that was found in the trash can at Mallory and Cervantez's apartment and duct tape found on Harris's wrists and ankles. Witkowski explained that there was no difference between the fibers, the adhesive, the backing, the width, or the color of the duct tape found in the trash can at Mallory and Cervantez's apartment versus the duct tape found on Harris's wrists and ankles. Thus, Witkowski concluded that the duct tape found on Harris's wrists and ankles could have originated from the same roll as the duct tape found in the trash can at Mallory and Cervantez's apartment.

**The DNA Evidence**

Uvonna Alexander, a senior forensic scientist in the biology unit at the FWPD Crime Lab, examined swabs taken from the floor mat in the Infiniti, which revealed that the partial major DNA profile originated from Harris but that Mallory and Cervantez were both excluded as minor contributors. The DNA profile obtained from the swab of the grip of the Glock 19 that was found in the Infiniti was a mixture of individuals: Harris and Mallory were included as the major contributors, but Cervantez was excluded as the minor contributor. The DNA profile obtained from the swab of the muzzle of the Glock 19 was a mixture of two individuals: the major DNA profile was identified as originating from Harris; Mallory could not be excluded as the minor contributor to the mixture; but Cervantez was excluded as the minor contributor. The DNA profile obtained from the swab of the butt rear slide and rear sight of the Glock 19 was a mixture of three individuals: the major DNA profile originated from Harris; Mallory could not be excluded as the minor contributor to the mixture; and Cervantez could not be excluded as a trace contributor to the mixture.

### III.  Sufficiency of the Evidence

In his first point, Mallory challenges the sufficiency of the evidence to support his conviction. Mallory argues that there is no evidence that he killed Harris and that Cervantez was "clearly the mastermind and is solely responsible" for Harris's death.

## A. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Jenkins*, 493 S.W.3d at 599.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Id.* at 448–49; *see Blea*, 483 S.W.3d at 33.

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins*, 493 S.W.3d at 599.

**B. Applicable Law**

As applicable in this case, a person commits the offense of capital murder if he commits murder as defined under Texas Penal Code section 19.02(b)(1) and intentionally commits the murder in the course of committing or attempting to commit robbery, obstruction, or retaliation. Tex. Penal Code Ann. § 19.03(a)(2). A person commits murder, as defined under Texas Penal Code section 19.02(b)(1), if he intentionally or knowingly causes the death of an individual. *Id.* § 19.02(b)(1).

A person commits the offense of robbery if, in the course of committing theft as defined in chapter 31 of the Texas Penal Code and with intent to obtain or maintain control of the property, he (1) intentionally, knowingly, or recklessly causes bodily injury to another or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. *Id.* § 29.02(a).

A person commits the offense of obstruction or retaliation if he intentionally or knowingly harms or threatens to harm another by an unlawful act in retaliation for or on account of the service or status of another as a person who has reported or who the actor knows intends to report the occurrence of a crime. *Id.* § 36.06(a)(1)(B).

18

A jury need not be unanimous about the underlying offense that elevates murder to capital murder. *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991).

Under the law of parties, a person is criminally responsible as a party to the offense, and thus may be charged with the commission of the offense, "if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." Tex. Penal Code Ann. § 7.01(a), (b). A person is criminally responsible for an offense committed by another if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2). In determining whether a person is a criminally responsible party to an offense, the factfinder may examine the events occurring before, during, and after the commission of the offense which show an understanding and a common design to do the prohibited act. *See Padilla v. State*, 326 S.W.3d 195, 200–01 (Tex. Crim. App. 2010).

## C. Analysis

Here, the jury charge included instructions concerning the law of parties, thus allowing the jury to convict Mallory of capital murder if it determined that he was a principal or a party to the offense.[8] *See* Tex. Penal Code Ann. § 7.02(a)(2), (b). The

---

[8]The jury charge included the following instruction:

All persons are parties to an offense who are guilty of acting together in the commission of the offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by

19

evidence demonstrated that both Mallory and Cervantez had been terminated from the American Eagle store at Hulen Mall and that they likely knew that Harris had named them as participants in the store's August theft. Both Mallory and Cervantez thus had a motive to retaliate against Harris. Because the evidence demonstrated that extreme force was necessary to fracture the cricoid, that a great deal of sustained pressure was necessary to fully asphyxiate someone, and that Harris was twice Cervantez's size,[9] the jury could have reasonably concluded that an actor other than Cervantez fractured Harris's cricoid and asphyxiated her. Moreover, based on the DNA evidence found on the gun and the nature of Harris's injuries, the jury could have believed that Mallory had used the Glock 19 that was found in Cervantez's car to pistol whip Harris—resulting in the blunt force trauma to her head and neck, which was listed as a cause of death. Viewed in the light most favorable to the verdict, and deferring to the jury's determinations of the weight to be given the evidence and credibility of the witnesses, the evidence supports the jury's verdict of guilt, whether the jury believed that Mallory was guilty as the principal actor or as a party. *See Stills v. State*, No. 01-17-00170-CR, 2018 WL 4086998, at *3 (Tex. App.—Houston [1st Dist.]

the conduct of another for whom he is criminally responsible, or by both. A person is criminally responsible for an offense committed by the conduct of another, if acting with the intent to promote or assist the commission of the offense, he encourages, directs, aids, or attempts to aid the other person to commit the offense. Mere presence alone does not constitute being a party to an offense.

[9]Cravey testified that Cervantez and Harris may have been the same height but that Harris was two times Cervantez's size.

20

Aug. 28, 2018, no pet.) (mem. op., not designated for publication) (holding evidence sufficient to support conviction for capital murder because evidence showed that appellant was the principal or a party to the capital murder); *Jones v. State*, 458 S.W.3d 625, 631–32 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (holding that the State presented sufficient evidence, which included DNA evidence, for a reasonable factfinder to conclude beyond a reasonable doubt that because appellant was one of the store's robbers, he was involved in the store owner's murder). We therefore hold the evidence sufficient to support Mallory's conviction for capital murder, and we overrule his first point.[10]

## IV. Motion to Suppress

In his second point, Mallory argues that the trial court abused its discretion by admitting evidence found on his cell phone. Although Mallory's second point does not mention his motion to suppress, we construe his argument—that the confiscation of his cell phone without a warrant or his consent violated his rights under the Fourth Amendment and Texas Code of Criminal Procedure article 38.23—as challenging the trial court's denial of his motion to suppress.

---

[10]To the extent that Mallory's first point urges this court to also conduct a review of the factual sufficiency of the evidence, we decline to do so. This court has not conducted a factual sufficiency review since the court of criminal appeals announced in *Brooks v. State* that the *Jackson* standard is the "only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." 323 S.W.3d 893, 912 (Tex. Crim. App. 2010).

## A. Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002).

When, as here, the record is silent on the reasons for the trial court's ruling, or when there are no explicit fact findings and neither party timely requested findings and conclusions from the trial court, we imply the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those findings. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *see Wiede v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007). We then review the trial court's legal ruling de novo unless the implied fact findings supported by the record are also dispositive of the legal ruling. *State v. Kelly*, 204 S.W.3d 808, 819 (Tex. Crim. App. 2006).

## B. Applicable Law

The Fourth Amendment protects against unreasonable searches and seizures by government officials. U.S. Const. amend. IV; *Wiede*, 214 S.W.3d at 24. To

suppress evidence because of an alleged Fourth Amendment violation, the defendant bears the initial burden of producing evidence that rebuts the presumption of proper police conduct. *Amador*, 221 S.W.3d at 672; *see Young v. State*, 283 S.W.3d 854, 872 (Tex. Crim. App. 2009). A defendant satisfies this burden by establishing that a search or seizure occurred without a warrant. *Amador*, 221 S.W.3d at 672. Once the defendant has made this showing, the burden of proof shifts to the State, which is then required to establish that the search or seizure was nonetheless reasonable under the totality of the circumstances. *Id.* at 672–73; *Torres v. State*, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005); *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005).

Under the Fourth Amendment, a warrantless arrest is unreasonable per se unless it fits into one of a "few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372, 113 S. Ct. 2130, 2135 (1993); *Torres*, 182 S.W.3d at 901. A police officer may arrest an individual without a warrant only if probable cause exists with respect to the individual in question and the arrest falls within one of the exceptions set out in the code of criminal procedure. *Torres*, 182 S.W.3d at 901; *see* Tex. Code Crim. Proc. Ann. arts. 14.01–.04.

Probable cause for a warrantless arrest requires that the officer have a reasonable belief that, based on facts and circumstances within the officer's personal knowledge, or of which the officer has reasonably trustworthy information, an offense has been committed. *Torres*, 182 S.W.3d at 901–02. Probable cause must be based on specific, articulable facts rather than the officer's mere opinion. *Id.* at 902. We use

the "totality of the circumstances" test to determine whether probable cause existed for a warrantless arrest. *Id.*

If probable cause existed for a warrantless arrest, "the police may legitimately 'seize' the property [such as a cell phone]" incident to that arrest. *State v. Granville*, 423 S.W.3d 399, 412 (Tex. Crim. App. 2014). A citizen, however, does not lose his reasonable expectation of privacy in the contents of his cell phone merely because that cell phone is being stored in a jail property room. *Id.* at 417. Police therefore generally may not, without a warrant, search digital information on a cell phone seized from an individual who has been arrested. *Riley v. California*, 134 S. Ct. 2473, 2493–94 (2014). If a warrant is obtained, neither the Fourth Amendment nor the Texas exclusionary rule in article 38.23(a) of the Texas Code of Criminal Procedure requires suppression of the information found on a cell phone because it was not obtained as a result of some illegality. *See Black v. State*, 358 S.W.3d 823, 828 (Tex. App.—Fort Worth 2012, pet. ref'd). *See generally* Tex. Code Crim. Proc. Ann. art. 38.23; *State v. Jackson*, 464 S.W.3d 724, 731 (Tex. Crim. App. 2015).

## C. Relevant Facts

After Mallory was booked into jail pursuant to his arrest for not having his driver's license in his possession, his cell phone, which was on his person, was seized and tagged as evidence. Police thereafter obtained a search warrant to analyze the contents of Mallory's cell phone.

Prior to the trial, Mallory filed a motion to suppress various items that were seized pursuant to ten warrants. With regard to search warrant #30199, Mallory argued in his motion to suppress that the supporting affidavit did not contain sufficient probable cause for the search warrant's issuance and that the object of the search—Mallory's cell phone—was seized without a warrant or consent in violation of article I, sections 9 and 19 of the Texas constitution; Texas Code of Criminal Procedure article 38.23; and the Fourth and Fourteenth Amendments to the United States Constitution. Mallory argued that the evidence obtained from the search of his cell phone should be suppressed under the fruit-of-the-poisonous-tree doctrine. Before voir dire commenced, the trial court denied Mallory's motion to suppress with regard to the search of Mallory's cell phone.

## D. Analysis

The record reflects that during the investigative detention,[11] Detective Pate discovered that Mallory did not have his driver's license with him, which when combined with Mallory's operation of the Infiniti on a public street, constituted a traffic offense. *See* Tex. Transp. Code Ann. §§ 521.021, 521.025(a), (c). An arrest for a minor traffic offense is not an unreasonable seizure under the Fourth Amendment. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354, 121 S. Ct. 1536, 1557 (2001); *State v. Gray*, 158 S.W.3d 465, 469 (Tex. Crim. App. 2005). The fact that the officer may have

---

[11]Mallory does not challenge the investigative detention that occurred in the mall parking lot other than to call it pretextual, arguing that Detective Pate's reason for speaking with him—that he was investigating car burglaries at the mall—was a lie.

25

had another subjective motive for seizing Mallory would not have made an objectively reasonable seizure unlawful under the constitutions of the United States or of this state. *See Gray*, 158 S.W.3d at 469–70. We conclude that Mallory was lawfully arrested.

Mallory was then transported to the jail. Once at the jail, Mallory's cell phone was removed from his person during the book-in process. Because Mallory was lawfully arrested and placed in jail, the administrative removal of his cell phone upon book-in was not an unlawful seizure.[12] *See Illinois v. Lafayette*, 462 U.S. 640, 648, 103 S. Ct. 2605, 2611 (1983) ("[W]e hold that it is not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures."); *Stephens v. State*, No. 05-16-01226-CR, 2018 WL 1443678, at *3 (Tex. App.—Dallas Mar. 23, 2018, pet. ref'd) (mem. op., not designated for publication) (holding that administrative removal of appellant's cell phone upon book-in was not an unlawful seizure).

---

[12]Mallory's oral argument on his second point varied from the point he briefed on appeal. During oral argument, Mallory contended that the retention of his cell phone was illegal. Because Mallory did not brief his retention argument, it is forfeited. *See* Tex. R. App. P. 39.2 ("Oral argument should emphasize and clarify *the written arguments in the briefs*.") (emphasis added); *Moore v. State*, 165 S.W.3d 118, 121 n.1 (Tex. App.—Fort Worth 2005, no pet.) ("An appellant may not raise new points during oral argument; therefore, we will not address these previously unmentioned offenses because they were not included in the written argument of Appellant's brief.").

The record demonstrates that after police had seized Mallory's cell phone, Officer #3014 prepared an affidavit seeking permission to conduct a forensic analysis on the cell phone.[13]   Based on the affidavit, which set forth substantial facts establishing probable cause, the judge signed the search warrant.  The search warrant was obtained before any analysis was performed on the cell phone.

Because no search of Mallory's cell phone occurred until after the officers had obtained a search warrant for the cell phone, we hold that the trial court did not err by denying Mallory's motion to suppress the contents of his cell phone.  *See Black*, 358 S.W.3d at 828.  We further hold that Mallory's constitutional rights were not violated by the forensic analysis of his cell phone's contents pursuant to a valid search warrant and that no violation of our exclusionary statute, article 38.23(a) of the Texas Code of Criminal Procedure, occurred.  Accordingly, we overrule Mallory's second point.

## V. Admission of Testimony, Photographs, and Diagrams

In his four remaining points, Mallory challenges the trial court's rulings admitting various testimony and pieces of evidence.

## A. Standard of Review

We review a trial court's evidentiary rulings under an abuse-of-discretion standard.  *See Jenkins*, 493 S.W.3d at 607.  A trial judge's decision is an abuse of discretion only when it falls outside the zone of reasonable disagreement.  *Winegarner*

---

[13]Because Mallory does not challenge the sufficiency of the affidavit, we do not analyze it.

*v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007). An evidentiary ruling will be upheld if it is correct on any theory of law applicable to the case. *Gonzalez v. State*, 195 S.W.3d 114, 126 (Tex. Crim. App. 2006).

## B. Applicable Law

Generally, to preserve error for review, a party's objection "must be specific enough so as to 'let the trial judge know what he wants, why he thinks himself entitled to it, and do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it.'" *Resendez v. State*, 306 S.W.3d 308, 312–13 (Tex. Crim. App. 2009) (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)). A general objection that evidence should not be admitted under rule 403 is not sufficient to preserve error because it fails to identify for the trial court which of the five distinct grounds for excluding evidence listed in the rule is being argued as a basis for exclusion.[14] *Checo v. State*, 402 S.W.3d 440, 451 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd); *Williams v. State*, 930 S.W.2d 898, 901 (Tex. App.—Houston [1st Dist.] 1996, pet. ref'd).

---

[14]Texas Rule of Evidence 403 provides:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence.

Tex. R. Evid. 403.

Moreover, the preservation rule requires a party to object each time objectionable evidence is offered unless the party has obtained a running objection or raises his objections at a hearing outside the presence of the jury. *Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003); *see also Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) (explaining that Texas applies the "futility rule," meaning that despite a trial court's ruling that evidence is admissible, a party must keep making futile objections on pain of waiver). Unobjected-to testimony about objected-to evidence results in forfeiture of the objection. *See Clay v. State*, 361 S.W.3d 762, 767 (Tex. App.—Fort Worth 2012, no pet.) ("[B]ecause Wallace provided testimony about the Louisiana records without objection before and after appellant's objection to the admission of the records and because appellant failed to obtain a running objection, we conclude that he forfeited his objection to the records' admission." (footnote omitted)); *see also Jones v. State*, No. 06-15-00119-CR, 2016 WL 3197397, at *5 (Tex. App.—Texarkana June 9, 2016, no pet.) (mem. op., not designated for publication) ("Smuts testified about the results of the DNA laboratory report. Therefore, we find that Jones waived his . . . complaints regarding the admission of the DNA report."). Furthermore, preservation of error is a systemic requirement that this court should review on its own motion. *Darcy v. State*, 488 S.W.3d 325, 327–28 (Tex. Crim. App. 2016).

## C. Analysis

### 1. Photographs of and Testimony about Grave-Sized Hole and Items Found in Mallory's Cadillac's Trunk

In his third and sixth points, Mallory argues that the trial court abused its discretion by admitting—over his rule 401 and rule 403 objections—State's Exhibits 393–399 and 400–402, which are photographs depicting the grave-sized hole discovered in Lueders, Texas, and items found in the trunk of a Cadillac owned by Mallory. Mallory further argues that the trial court abused its discretion by admitting Detective Cedillo's testimony about those photographs.

The record does not reflect that Mallory asserted a rule 401 or a rule 403 objection to Detective Cedillo's testimony about the content of the photographs. Mallory objected only to the admission of the photographs based on those grounds. Mallory therefore forfeited his complaints regarding the admission of Detective Cedillo's testimony about the photographs of the grave-sized hole and the items found in the Cadillac's trunk. *See Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012); *Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009); *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009). Moreover, because Mallory did not object to Detective Cedillo's testimony describing what the photos depicted and did not request a running objection to the admission of the photographs based on his rule 401 and 403 objections, we hold that any error in the admission of the photographs showing the grave-sized hole and the items found in the Cadillac's trunk was forfeited. *See Leday*, 983 S.W.2d at 718; *Clay*, 361 S.W.3d at 767; *Warren v. State*, No. 02-17-

30

00221-CR, 2018 WL 3764069, at *6 (Tex. App.—Fort Worth Aug. 9, 2018, pet. ref'd) (mem. op., not designated for publication); *Walker v. State*, No. 02-16-00418-CR, 2018 WL 1096060, at *4 (Tex. App.—Fort Worth Mar. 1, 2018, no pet.) (mem. op., not designated for publication).[15] Accordingly, we overrule Mallory's third and sixth points.

### 2. Photographs of Victim in Her Apartment

In his fourth point, Mallory contends that the trial court abused its discretion by admitting—over his rule 403 objections—State's Exhibits 27–30, which are photographs depicting Harris as she was found in her apartment on November 28.

When the State offered the challenged exhibits, Mallory made a general rule 403 objection. Later, the State asked Crime Scene Officer Pilar Ramirez the following:

Q. Okay. State's Exhibit 27, what is that?

A. That's the victim laying on the floor next to her bed on the -- on the floor near the door. It's a small bedroom.

---

[15]Mallory's arguments in his sixth point—that "[t]he proper predicate was not laid for the introduction of the State's evidence" and that "[t]he court did not conduct a balancing test as is required by [r]ule 403"—are not preserved for our review because he did not object on these grounds in the trial court. *See Clark*, 365 S.W.3d at 339; *Lovill*, 319 S.W.3d at 691–92; *Pena*, 285 S.W.3d at 464; *Jennings v. State*, No. 02-16-00300-CR, 2017 WL 3633992, at *7 (Tex. App.—Fort Worth Aug. 24, 2017, no pet.) (mem. op., not designated for publication) (holding that appellant forfeited predicate complaints and balancing-test complaints by failing to object on those grounds at trial). To the extent that Mallory repeats these arguments in his fourth and fifth points, they are likewise not preserved for our review.

Q. And was that the condition that she was in when you first walked into that room?

A. Yes.

Q. And State's Exhibit 28, a closer-up view of her, what are we taking a picture of here?

A. Both of her hands are bound with duct tape.

Q. And State's Exhibit 29?

A. Both of her ankles and feet were also bound with duct tape.

Q. Now looking at State's Exhibit 30, is this just a better view of the bed and the condition that it was in?

A. Yes.

As the above excerpt shows, Mallory did not object to Officer Ramirez's testimony describing what was depicted in the photographs, nor did Mallory seek a running objection. We therefore hold that any error in the admission of State's Exhibits 27–30 was forfeited. *See Leday*, 983 S.W.2d at 718; *Clay*, 361 S.W.3d at 767; *Warren*, 2018 WL 3764069, at *6; *Walker*, 2018 WL 1096060, at *4. We overrule Mallory's fourth point.

### 3. Autopsy Photographs and Diagrams

In his fifth point, Mallory argues that the trial court abused its discretion by admitting—over his rule 403 objections—State's Exhibits 224, 226, 228, 230, 232, 236, 238, 242, 247, 249, 256, 258, 261, 264, 266–269, 272–280, 466, and 467, which are photographs and diagrams from the autopsy. At trial, when the State offered these 29 exhibits, Mallory stated, "Judge we would object to all of these under 403."

32

Mallory's general rule 403 objection was not specific enough to let the trial judge know why Mallory believed the objected-to State's exhibits were not admissible based on rule 403. *See Resendez*, 306 S.W.3d at 312–13; *Checo*, 402 S.W.3d at 451. Because Mallory's rule 403 objection was not sufficiently specific, Mallory forfeited any error in the admission of these challenged exhibits. *See* Tex. R. App. P. 33.1(a)(1)(A); *Checo*, 402 S.W.3d at 451; *Williams*, 930 S.W.2d at 901; *Page v. State*, No. 02-17-00019-CR, 2017 WL 4819404, at *3 (Tex. App.—Fort Worth Oct. 26, 2017, pet. ref'd) (mem. op., not designated for publication) (holding appellant's objections—"I make a 403 objection to 69" and "[s]eventy-four, objection under 403"—not sufficiently specific to preserve error for review). We overrule Mallory's fifth point.

## VI. Conclusion

Having overruled Mallory's six points, we affirm the trial court's judgment.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: February 14, 2019